UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SHEILA A. CYMAN,

                           Plaintiff,

       -vs-                     **No. 1:13-CV-00707 (MAT)**
                                     **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                      Defendant.

---

## I. Introduction

Represented by counsel, Sheila A. Cyman ("plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, the plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## II. Procedural History

The record reveals that on June 18, 2010, plaintiff protectively filed applications for DIB and SSI, alleging disability as of September 1, 2009 due to back problems,

depression, claustrophobia, carpel tunnel syndrome ("CTS"), severe post-traumatic stress disorder ("PTSD"), hypothyroidism, and fibromyalgia. After her application was denied, plaintiff requested a hearing, which was held before administrative law judge William M. Weir ("the ALJ") on December 16, 2011. The ALJ issued an unfavorable decision on April 26, 2012. The Appeals Council denied review of that decision and this timely action followed.

**III. Summary of the Evidence**

    **A.    Testimonial Evidence**

Plaintiff, who was 42 years old at the time of her hearing, testified that in the past she had worked as a business systems analyst, drill press operator, and employee recruiter, and that she had last worked in 2011 in retail. She testified that her current treating physicians included Dr. Michalski for arthritis, Dr. Callahan for CTS and right arm issues, Dr. Delamarty (phonetic) for general care, Dr. Amarante for psoriasis, and Dr. Choe for psychiatric treatment.

Plaintiff testified that she suffered from psoriasis, which caused itching, and that she had associated arthritis, which made "walking an issue" and walking up stairs painful. T. 55. She testified that she had constant knee and back pain. Plaintiff testified that medications she received for these conditions did not help, and that she "[got] severe headaches" as a side effect from psoriasis medication. T. 57. Plaintiff testified that after

2

surgery for CTS, that condition was "better." T. 63. Specifically, she testified that she had "more motor control, but the endurance is still an issue." Id.

Plaintiff testified that she had been diagnosed with depression, PTSD, and agoraphobia. She also testified that she had panic attacks when "hearing the refrigerator open/close, or a door, or people walking up and down the stairs." T. 59. She testified that she had panic attacks "every two or three days." Id. She generally testified that she experienced stress in dealing with people and so preferred to avoid it, also stating that she timed trips to the grocery store so as to avoid crowds. Plaintiff testified that she usually stayed at home with her cat, and that her mother visited "every other day or so." T. 64. She testified that she rarely cooked and currently was eating only every two to three days. She stated that she did the cleaning around her house, but "[n]ot regularly." T. 65.

**B. Medical Evidence**

Plaintiff's medical records indicate consistent diagnoses of CTS, gastroesophageal reflux disease ("GERD"), anxiety disorder, major depressive disorder, and PTSD. In November 2008, Kim Lewis Schepart, a crisis counselor with Lake Shore Behavioral Health ("Lake Shore"), stated that plaintiff had been treating at Lake Shore for several months and had diagnoses of PTSD and major depressive disorder. Ms. Schepart stated that plaintiff "suffer[ed]

3

from extreme symptoms of anxiety which have caused insomnia, racing thoughts, and social withdrawal," and requested that plaintiff's then-treating physician, Dr. Trock, prescribe medication for anxiety symptoms pending plaintiff's upcoming treatment with a nurse practitioner at Lake Shore. T. 280.

Treatment notes from Lovejoy St. Vincent Health Center from February through July 2010 document plaintiff's complaints of anxiety, pain associated with CTS, and other symptoms associated with hyperthyroidism and early menopause. Specifically regarding anxiety, in May 2010, Dr. James Stephen noted that plaintiff reported "disabling" anxiety attacks which occurred two to three times per week, lasted three to four hours each, and rendered her unable to "leave the house." T. 288. Dr. Stephen recorded that plaintiff seemed to be "having [an] attack now." T. 288. In June 2010, Dr. Stephen recorded a follow-up visit regarding "panic attacks," and in July 2010, he again noted "severe anxiety." T. 292-93.

A May 2010 initial psychiatric consultation with Dr. Patrick Hurley assessed plaintiff as "a woman with a history of panic disorder who has done reasonably well [taking] Xanax," and stated that plaintiff also "ha[d] episodic alcohol abuse." T. 209. Dr. Hurley diagnosed plaintiff with panic disorder and alcohol abuse on Axis I, and chronic pain, possible fibromyalgia, hyperthyroidism, and GERD on Axis III. He assessed her with a GAF

4

(global assessment of functioning) score of 50, which score signifies serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). See generally American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 34 (4th ed. rev. 2000). Dr. Hurley saw plaintiff again in July 2010, and added a diagnosis of major depressive disorder, for which he prescribed medication.

Plaintiff treated with Dr. John Callahan, primarily for CTS symptoms related to a workers compensation claim, on a monthly basis from March 2010 through August 2011. Throughout this treatment through early May 2011, plaintiff, who had had a prior CTS surgery on her right hand, complained of pain and swelling in her right hand, elbow, and arm, and was given cortisone injections and Lortab for pain. Through May 2011, Dr. Callahan consistently rated her disability as moderate, at 50 percent, for workers compensation purposes. In May 2011, plaintiff underwent carpal tunnel release surgery for right cubital tunnel syndrome, right carpal tunnel syndrome, and right flexor carpal radialis tendonitis at the wrist. On May 20, 2011, she reported to Dr. Callahan that she continued to experience pain in the right hand, elbow, and wrist. In August 2011, plaintiff reported that she had "tried a new job, but had to leave it due to pain in the right hand putting

5

price tags on clothing for retail sale." T. 401. On that same date, Dr. Callahan ordered an occupational therapy evaluation and treatment two to three times per week for four weeks, noted that "[t]herapy should focus specifically on soft tissue mobilization, range of motion, and functional training," and stated that there were "no limits or restrictions on activities during therapy." T. 404. From May through August 2011, Dr. Callahan rated plaintiff's disability as total, at 100 percent.

Plaintiff treated episodically at Mercy Hospital of Buffalo from July 2007 through August 2011. During this period plaintiff visited the hospital for various complaints, including repeated episodes of shortness of breath in 2007-2008, a panic attack in April 2010, follow-up treatment associated with her May 2011 CTS surgery, and treatment in August 2011 for a rash and allergic reaction to medication.

Psychologist M. Totin submitted a psychiatric review technique form dated September 2, 2010, which declined to make any findings whatsoever due to insufficient evidence. Specifically, Dr. Totin stated that "[t]wo requests were made for [plaintiff] to complete activities of daily living questions with no response," noted that plaintiff was represented by an attorney, and stated that there was "insufficient evidence to adjudicate this claim." T. 235. The ALJ made no mention of this form in his opinion.

In September 2011, Dr. Hong Rak Choe at Lake Shore noted a history of alcohol abuse and PTSD symptoms associated with "trauma from sexual molestation, mental abuse by family and physical abuse by aunt." T. 500. On mental status examination, plaintiff was mildly anxious; her affect was mildly tense but "fairly appropriate"; her thought was well-organized; she was oriented to time, place, and person; her memory was "fairly well preserved"; she concentrated "fairly well"; she was "able to do a Series 7s with some difficulty"; no signs of deterioration of intellectual functioning were noted; abstractive thinking was "fairly appropriate"; she had "some insight"; and judgment was "reasonable." T. 501. Dr. Choe diagnosed plaintiff, on Axis I, with PTSD and major depressive disorder, recurrent. On mental status examination in November 2011, Dr. Choe assessed plaintiff as essentially normal, except for depressive thought content and anxious mood.

Treatment notes from Dr. Lynn Amarante, which span a mere five pages of the record, indicate that plaintiff saw Dr. Amarante in September and October 2011 for headache pain and a severe rash associated with psoriasis. Treatment notes from Dr. Stanley Michalski, which constitute eight pages of the record, indicate that plaintiff treated with Dr. Michalski in November and December 2011 for psoriatic arthritis. Dr. Michalski diagnosed plaintiff with spondylosis, pain in joint at multiple sites, unspecified

7

osteoporosis, and psoriasis related disease. Imaging tests revealed osteoporosis and mild annular bulging at L4-5 and L5-S1 with disc degeneration noted, but an otherwise unremarkable lumbar spine.

**IV. The ALJ's Decision**

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. Initially, the ALJ found that Plaintiff met the insured status requirements of the Act through September 30, 2012. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 1, 2009, the alleged onset date. At step two, the ALJ found that plaintiff had the following severe impairments:psoriatic arthritis, osteoporosis, CTS, and PTSD. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

Before proceeding to step four, the ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), which did not involve complex tasks. The ALJ did not specifically set forth any detail regarding plaintiff's functional limitations or restrictions or assess her work-related abilities on a function-by-function basis, but merely stated that plaintiff was capable of performing sedentary work.

The record contained no functional assessment whatsoever from any treating or consulting source. In evaluating the evidence in order to determine plaintiff's RFC, the ALJ gave "great weight" to the "opinions" of Drs. Amarante and Michalski, while noting that "neither physician has prepared a formal residual functional capacity evaluation." T. 34. Rather, the ALJ gave weight to their treatment notes which, according to the ALJ, "demonstrate[d] that the claimant retain[ed] at least the capacity for performing at least sedentary work." Id. The ALJ also gave "great weight to Dr. Callahan's conclusion that following her right hand and elbow surgery the [plaintiff] had no further right upper extremity limitations *for purposes of therapy* and for which the record does not support a finding she ever attended." Id. (emphasis supplied). Finally, the ALJ gave "great weight" to the treatment note of Dr. Choe. According to the ALJ, Dr. Choe's September 2011 report, "while suggesting the claimant [was] diagnosed with mental impairments, clearly show[ed] that her level of functioning [was] much greater that the [plaintiff] would have [the ALJ] believe." Id. "All four of these physicians, Drs. Amarante, Michalski, Callahan and Choe," according to the ALJ, "present[ed] a picture of the [plaintiff] that strongly suggests the most reasonable conclusion in this case is that the [plaintiff] retains the capacity for work activity[.]" Id.

9

At step four, the ALJ found that plaintiff was unable to perform her past relevant work as a telemarketer, typist, or computer analyst, because that work was semi-skilled in nature. At step five, the ALJ determined that considering plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that plaintiff could perform. The ALJ relied on the Medical-Vocational Guidelines ("the grids"), specifically grid rule 204.00, in determining that plaintiff could perform work despite her nonexertional impairments.

## V. Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

Plaintiff contends that the ALJ erred in assessing her mental and physical RFCs and by failing to develop the record. Because plaintiff's argument regarding failure to develop the record is intertwined with her arguments regarding the ALJ's RFC assessment, the ALJ's failure to develop the record is addressed below together

with the Court's analysis of the ALJ's mental and physical RFC assessments.

**A.   Mental RFC**

In assessing plaintiff's mental functioning, under the "B" criteria of the listings, the ALJ found that plaintiff had no limitations in activities of daily living ("ADLs") or social functioning, no repeated episodes of decompensation of extended duration, and moderate difficulties in social functioning. The ALJ then proceeded to determine that plaintiff's sole nonexertional impairment was a necessity for unskilled work requiring no complex tasks. It is unclear how the ALJ came to this conclusion, and it is also unclear whether the ALJ actually incorporated his finding that plaintiff had "moderate" impairments in social functioning into his overall RFC assessment.

In evaluating plaintiff's testimony, the ALJ discounted her reports of anxiety and suggested there was no record evidence to support such anxiety. Although the ALJ acknowledged that Dr. Hurley's treatment notes reflected plaintiff's reports of anxiety, the ALJ stated that

> there [was] no evidence in the record of the claimant reporting such severe panic attacks as to prevent her breathing over such incidents as alleged, such as a refrigerator opening or a doorbell ringing. If this had indeed been the case for years, as the claimant would have me believe, the record would be replete with mentions of such attacks, and at least the search for significant, ongoing treatment in order to cope with them. If such attacks actually took her breath away and had indeed been occurring two to three times a week, as

11

> she testified, there would have been hundreds of such
> attacks since her alleged onset, and it would have been
> a central topic of discussion and treatment during the
> few times she visited mental health centers. Nothing of
> the sort appears in the record.

T. 30. This statement by the ALJ is unsupported by the record and is imbued with speculation as to what, in the ALJ's opinion, the record "would have" consisted of if plaintiff's reports were credited.

Although the evidence does not reflect continuous treatment for mental health problems, the record is in fact replete with references to anxiety disorder and major depressive disorder. Crisis counselor Schepart and Dr. Choe documented plaintiff's diagnosis of anxiety disorder; Dr. Hurley diagnosed plaintiff with anxiety disorder and assessed her GAF score at 50, indicating serious symptoms; plaintiff was treated at Mercy Hospital for a panic attack; and Dr. Stephen noted on three occasions plaintiff's anxiety and panic attacks, stating on one occasion that it appeared she was having one at that very moment, and noting plaintiff's reports that she experienced two to three "disabling attacks" per week which rendered her unable to "leave the house," which attacks lasted three to four hours each. T. 288.

The record evidence thus documents plaintiff's history of anxiety disorder and panic attacks, yet the ALJ made no effort to obtain any medical opinions regarding possible resulting functional limitations. Instead, he dismissed plaintiff's record of mental

impairments and discredited her testimony. As discussed above, a psychiatric review technique form was submitted but not completed, due to insufficient evidence, because plaintiff failed to provide responses to an ADL questionnaire. The ALJ made no mention of this form in his opinion. Moreover, the ALJ did not request any consulting psychiatric examination, nor did he request that a mental RFC be completed. Dr. Choe's treatment note from September 2011, to which the ALJ gave "great" weight, did not contain any functional assessment of plaintiff's ability to do work. Yet, inexplicably, the ALJ concluded that this single report, "while suggesting the [plaintiff] is diagnosed with mental impairments, clearly shows that her level of functioning is much greater than [plaintiff] would have [him] believe." The record does not support this.

The regulations provide that although a claimant is generally responsible for providing evidence upon which to base an RFC assessment, before the Administration makes a disability determination, the ALJ is "responsible for developing [the *claimant's*] complete medical history, *including arranging for a consultative examination(s) if necessary*, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545 (emphasis supplied) (citing 20 C.F.R. §§ 404.1512(d) through (f)). Although the RFC determination is an issue reserved for the

13

commissioner, "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." Dailey v. Astrue, 2010 WL 4703599, *11 (W.D.N.Y. Oct. 26, 2010) (quoting Deskin v. Comm'r of Soc. Sec., 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)).

Considering the record evidence of mental impairments, and the lack of a functional assessment from any qualified medical source, the ALJ's determination of plaintiff's mental RFC without reference to any treating source or consulting opinions was reversible error. See, e.g., Stokes v. Astrue, 2012 WL 695856, *11 (N.D.N.Y. Mar. 1, 2012) (reversing and remanding where ALJ determined mental RFC without reference to any medical assessment of functional limitations, and where record contained evidence of mental impairments). The case is therefore remanded for reconsideration of plaintiff's mental RFC. On remand, the ALJ is directed to contact plaintiff's treating sources for opinions as to plaintiff's mental functional limitations, and to order consulting opinions as necessary.

**B.   Physical RFC**

The record similarly contains no functional assessment of plaintiff's physical capabilities. The ALJ's decision, in giving "weight" to certain treating "opinions," actually amounted to an impermissible interpretation of bare medical findings, which is

14

prohibited by the regulations. See Dailey, 2010 WL 4703599, at *11. Dr. Callahan's "conclusion" that plaintiff "had no further right upper extremity limitations for purposes of therapy," for example, came at a time when Dr. Callahan assessed plaintiff at 100 percent disability and related to plaintiff's capacity *to participate in physical therapy*, not to participate in work activities. Additionally, the ALJ's reliance on the records of Drs. Amarante and Michalski, which together spanned 13 pages of a 523-page administrative record, was insufficient to formulate a proper RFC assessment. Those records indicate diagnoses of psoriatic arthritis and osteoporosis and document reports of pain and other symptoms, but do not indicate what limitations, if any, resulted from those impairments. A review of the administrative record thus demonstrates that the ALJ had no functional capacity assessment upon which to rely, but instead substituted his own medical judgment. This was error.

Moreover, although the ALJ's RFC assessment found that plaintiff was capable of performing sedentary work, nowhere in his decision does the ALJ explain what functional limitations, if any, supported this determination. "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945. Only

after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Soc. Sec. Ruling ("SSR") 96-8p, 1996 WL 374174, *1 (July 2, 1996). Indeed, the ALJ could not reference any limitations as given by a medical source, because no medical source opinion was present in the record.

Again, it is the ALJ's duty to develop a complete medical history, which includes functional assessments of a claimant's physical limitations. 20 C.F.R. § 404.1545. The ALJ's failure to do so in this case was reversible error. See, e.g., Hernandez v. Comm'r of Soc. Sec., 2015 WL 275819, *2 (N.D.N.Y. Jan. 22, 2015) (reversing and remanding for ALJ to obtain opinion of treating physician or other medical source) (citing McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)); Gross v. Astrue, 2014 WL 1806779, *18 (W.D.N.Y. May 7, 2014) (holding that remand was appropriate where the ALJ determined a claimant's RFC "primarily . . . through her own interpretation of various MRIs and x-ray reports contained in the treatment records"); Haskins v. Astrue, 2010 WL 3338742, *5 (N.D.N.Y. Apr. 23, 2010), report and recommendation adopted, 2010 WL 3338748 (N.D.N.Y. Aug. 23, 2010) (reversing and remanding case where "[t]he ALJ failed to re-contact Plaintiff's treating physicians, failed to obtain an SSA consultative examination, and failed to request the opinion of a medical expert").

This case is therefore remanded for proper consideration of plaintiff's RFC in accordance with the regulations. On remand, the ALJ is directed to contact plaintiff's treating sources for opinions as to plaintiff's physical functional limitations, and to order consulting opinions as necessary.

**VI. Conclusion**

For the foregoing reasons, the Commissioner's cross-motion for judgment on the pleadings (Doc. 18) is denied, and plaintiff's motion for judgment on the pleadings (Doc. 10) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

                                        **S/Michael A. Telesca**

                                      HON. MICHAEL A. TELESCA
                                      United States District Judge

Dated:    September 9, 2015
            Rochester, New York.